# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ANTHANETTE MARSHBANKS, as Special Administrator of the Estate of Archie Lee Chambers, Jr., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 13 C 2978 |
| v. | ) ) | |
| CITY OF CALUMET CITY, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On January 17, 2014, Plaintiff Anthanette Marshbanks, as the Special Administrator of the Estate of Archie Lee Chambers, Jr., brought an eight-count Second Amended Complaint against Defendants City of Calumet City and individual Calumet City police officers alleging the deprivation of his constitutional rights under 42 U.S.C. § 1983, as well as state law claims. *See* 28 U.S.C. §§ 1331, 1367(a). Before the Court is Defendants' motion for partial summary judgment as to Counts I, III, IV, and V of the Second Amended Complaint brought pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court denies Defendants' summary judgment motion. Further, the Court grants in part Plaintiff's motion to strike portions of Defendants' statement of facts, as discussed below.

## BACKGROUND

### I. Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008).

In general, the purpose of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco*, 559 F.3d at 632; *see also Frey Corp. v. City of Peoria, Ill.,* 735 F.3d 505, 513 (7th Cir. 2013).

In sum, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the

way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012). With these standards in mind, the Court turns to the relevant facts of this case.

**II.     Relevant Facts**

Plaintiff Anthanette Marshbanks is the mother of decedent Archie Chambers ("Chambers") and the Administrator of his Estate. (R. 145, Defs.' Rule 56.1 Stmt. Facts ¶ 2.) Defendant City of Calumet City ("Calumet City") is an Illinois municipal corporation under the laws of the State of Illinois. (*Id.* ¶ 3.) Defendant Officers Brian Gerstner, Joseph Fisher, Thomas Mottl, James Lucius, Steven Hintz, and Lamar Laster were police officers for the Calumet City Police Department during the relevant time period. (*Id.* ¶ 4.)

On the evening of April 20, 2012, the Undisputed Car Club (the "Club") was hosting a party at the What's Up Bar and Grill on Torrence Avenue in Calumet City. (*Id.* ¶ 5.) The Club, of which Chambers was a member, is an organization of individuals who own and drive Chevy Impala or Pontiac Grand Prix automobiles. (*Id.* ¶¶ 6, 9.) At approximately 1:48 a.m. on April 21, 2012, the Calumet City Police Department's dispatch center received multiple 911 calls of shots being fired at the What's Up Bar and Grill. (*Id.* ¶ 24.) The Calumet City Police Department dispatcher announced to the police officers on duty that shots were fired and that a subject was down. (*Id.* ¶ 25.) The dispatchers also announced that they were hearing gunshots at the scene as they were putting the call out and Defendant Officers either heard shots from their vehicles or over the radio dispatch as they drove to the scene. (*Id.* ¶ 26.) The dispatcher did not give Defendant Officers a physical description of the shooter(s) during the dispatch call. (*Id.* ¶ 27; R. 158, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶ 4.)

3

When it was announced that shots had been fired, Club members Geno Powers and Chambers were inside the What's Up Bar and Grill, and, upon hearing the news, Powers, Chambers, and several other individuals ran outside. (Defs.' Stmt. Facts ¶ 28.) Upon exiting the bar, Powers and Chambers went to the south side of the parking lot where they saw two Club members, Willie White and Michael Harris, both of whom were lying on the ground. (*Id.*)

The Calumet City Police Department is about four blocks from the What's Up Bar and Grill. (*Id.* ¶ 32.) Defendant Officers, who were all near the bar, took approximately one to two minutes to get to the scene after receiving the dispatcher's call. (*Id.*) Defendant Officers were in marked squad cars and were wearing full police uniforms. (*Id*. ¶ 33.) Also, Defendant Officers used their emergency lights and sirens while en-route to the bar. (*Id*.) When Defendant Officers arrived, there were at least 150 people in the parking lot. (*Id.* ¶ 39.) The people in the parking lot were screaming and the scene was chaotic. (*Id*.) When Defendant Officers reached the parking lot, they tried to control the crowd. (Pl.'s Stmt. Facts ¶ 5.) At that time, people pointed to the two injured men on the ground, namely, Harris and White. (Defs.' Stmt. Facts ¶ 41.) Defendant Officer Gerstner then approached Harris and informed him that an ambulance was on the way. (*Id.* ¶ 42.) At that time, Harris did not tell Defendant Officers who had shot him. (*Id*.) Meanwhile, White was unconscious. (*Id*. ¶ 41.) In addition, there is evidence in the record that an individual at the scene of the shooting told Defendant Officer Lucius that the shooter(s) left the scene in a gray car traveling south on Torrence Avenue. (Pl.'s Stmt. Facts ¶ 7; R. 148-18, Lucius Dep., at 86-88, 91.)[1]

---

[1] Defendant Officers argue that this statement is hearsay, and thus inadmissible for summary judgment purposes. The individual's statement that the shooters left the scene of the shooting goes to Defendant Lucius' state of mind, namely, what he knew at the time of the

Thereafter, Chambers emerged from between two parked vehicles and fired two to three shots in the air in the presence of Defendant Officers. (*Id.* ¶ 12; Defs.' Stmt. Facts ¶ 43.) When Defendant Officer Fisher observed him, Chambers' arm was straight up in the air and when Defendant Officer Gerstner observed him, Chambers was about four to five car lengths away. (*Id.* ¶ 44.) Also, at that time, Defendant Officer Lucius saw a muzzle flash straight up in the air. (Pl.'s Stmt. Facts ¶ 11.) It is undisputed that Chambers did not discharge his weapon when it was level. (*Id.* ¶ 18.)

The parties dispute whether Defendant Officers gave Chambers any commands after Chambers fired the shots in the air, although several Defendant Officers and Powers testified that the officers told Chambers to drop his weapon. (*Id.* ¶¶ 14, 15; Defs.' Stmt. Facts ¶¶ 47, 48.) Also, the parties dispute whether Chambers dropped his gun at that time, although two Defendant Officers testified that Chambers drop his gun after certain Defendant Officers discharged their weapons at Chambers. (Pl.'s Stmt. Facts ¶¶ 16, 17, 18, 23, 26; Defs.' Stmt. Facts ¶¶ 50-52.) It is undisputed that the Defendant Officers who saw Chambers drop his gun did not tell any of the other officers or yell at the officers to stop shooting. (Pl.'s Stmt. Facts ¶ 21.)

Chambers then ran to a nearby fence on the south side of the parking lot that was approximately six feet tall, grabbed the top of the fence with both hands, and pulled himself over. (Pl.'s Stmt. Facts ¶¶ 20, 37; Defs.' Stmt. Facts ¶¶ 51, 56.) It is undisputed that Chambers did not have a gun in his hand when he climbed the fence, yet at least one Defendant Officer

---

incident, and thus is not impermissible hearsay. *See* Fed.R.Evid. 801(c). It is not offered for the truth of the matter.

fired at Chambers when he was at the top of the fence. (Pl.'s Stmt. Facts ¶¶ 39, 40.) Chambers' body then dropped straight to the ground on the other side of the fence. (*Id*. ¶ 42.) Defendant Officers went to the other side of the fence, and, when they arrived they discovered that Chambers was dead. (Defs.' Stmt. Facts ¶¶ 57, 58.) No gun was found on Chambers' body. (Pl.'s Stmt. Facts ¶ 43.) Also, Defendant Officer Lucius testified that Chambers did not shoot at the police officers. (*Id.* ¶ 45.) In addition, it is undisputed that at no time while Chambers was running toward the fence did he act as if he was going to fire at the police officers. (*Id.* ¶ 46.) Later, it was determined that Defendant Officers fired a total of 11-13 times at Chambers, including after he dropped his gun. (*Id*. ¶¶ 32, 34, 40, 50, 55; Defs.' Stmt. Facts ¶ 59.) Chambers' autopsy revealed that he suffered three gunshot wounds, including a wound to his chest, right hand, and left thigh. (Pl.'s Stmt. Facts ¶ 51.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary

judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). A court's "job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## ANALYSIS

### I. Count I — Excessive Force

Plaintiff alleges a Fourth Amendment excessive force claim in Count I of the Second Amended Complaint.[2] "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard,* 134 S.Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In short, "[w]hen an officer stops or arrests an individual, some degree of physical force may be used, but the Fourth Amendment requires that the degree of force used be reasonable." *Rabin v. Flynn,* 725 F.3d 628, 636 (7th Cir. 2013). In *Graham*, the Supreme Court "held that determining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at

---

[2] In Count II, Plaintiff brings an excessive force claim against Calumet City based on *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Earlier in these proceedings, the parties agreed to bifurcate *Monell*-related discovery. (R. 60, 12/5/13, Order, at 3.) The Court, however, denied Defendants' motion to bifurcate Plaintiff's claims for trial as premature. (*Id.*) In addition, Defendants have not moved for summary judgment as to Count II. Therefore, Plaintiff's *Monell* claim in Count II of the Second Complaint remains in this lawsuit, especially because the Court is denying Defendants' summary judgment motion as to Plaintiff's excessive force claim in Count I. *See Swanigan v. City of Chicago,* ___ F.3d ___, 2015 WL 128123, at *8 (7th Cir. Jan. 9, 2015).

stake.'" *Plumhoff,* 134 S.Ct. at 2023 (citation omitted). "In assessing whether an officer's use of force violates the Fourth Amendment, [courts] ask whether the officer's actions are objectively reasonable in light of the information known at the time of an arrest." *Miller,* 761 F.3d at 828-29. "This question turns on the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 829 (quoting *Graham,* 490 U.S. at 396). Moreover, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397.

Viewing the totality of the facts and circumstances Defendant Officers knew at the time of the shooting[3] and construing the facts and all reasonable inferences in Plaintiff's favor, Plaintiff has set forth evidence creating a genuine factual dispute as to whether Defendant Officers used objectively reasonable force in their attempt to apprehend Chambers. *See Anderson*, 477 U.S. at 248 (genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). More specifically, Plaintiff has set forth evidence that once Defendant Officers arrived to the What's Up Bar and

---

[3] Plaintiff has filed a motion to strike portions of Defendants' Rule 56.1 statements regarding information about Chambers and the Undisputed Car Club that Defendant Officers did not know at the time of the April 21, 2012 shooting. (*See* Pl.'s Stmt. Facts ¶¶ 1-3.) The Court will not discuss these facts in addressing Plaintiff's Fourth Amendment excessive force claim because they are not relevant to the standard set forth in *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and its progeny. Accordingly, the Court grants Plaintiff's motion to strike in this regard.

Grill's parking lot, they encountered a scene that was chaotic due to the earlier shooting of two individuals. At that time, an individual told Defendant Officer Lucius that the shooters had driven away in a gray car traveling south on Torrence Avenue. Thereafter, Defendant Officers encountered Chambers, who had walked between cars in the parking lot and fired shots straight up in the air. Although the parties dispute whether Defendant Officers gave Chambers any commands after he fired the shots, there is evidence in the record that Chambers dropped his gun at that time or shortly thereafter. There is also evidence in the record that Defendant Officers fired at Chambers approximately 11-13 times, including after he dropped his gun and while he was running toward the fence. That Chambers dropped his gun is supported by the fact that it is undisputed that he did not have a gun while he was climbing the fence and no gun was found on Chambers' body after he jumped the fence. Moreover, there is evidence in the record that Chambers did not shoot at the police and it is undisputed that at no time while Chambers was running toward the fence did he act as if he was going to fire at the police officers. Indeed, he had already dropped his gun. Construing these facts and all reasonable inferences in Plaintiff's favor, Defendant Officers' use of deadly force after Chambers dropped his gun was not objectively reasonable—even though Chambers was fleeing the scene—because evidence suggests that Chambers did not pose an immediate threat to the police officers or the crowd at that time. *See Graham,* 490 U.S. at 396.

    Citing *Brosseau v. Haugen,* 543 U.S. 194, 197-98, 125 S.Ct. 596, 160 L.E.2d. 583 (2004) (per curiam), Defendant Officers argue that because they had probable cause to believe that Chambers posed a threat of serious physical harm, it was not unreasonable to prevent his escape by using deadly force. *See also Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85

9

L.Ed.2d 1 (1985) (use of deadly force to prevent escape only justified if officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the police or others"). Because *Brosseau*'s holding is the in context of the affirmative defense of qualified immunity, the Court turns to Defendant Officers' qualified immunity arguments.

"Even when a public official's actions have violated a plaintiff's constitutional rights, the official can escape liability if the right was not clearly established at the time of the violation." *Findlay v. Lendermon,* 722 F.3d 895, 899 (7th Cir. 2013). In other words, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Humphries v. Milwaukee Cnty.,* 702 F.3d 1003, 1006 (7th Cir. 2012) (quotation marks and citation omitted). To fulfill this standard, a plaintiff must show that the right is clearly established such that "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Findlay*, 722 F.3d at 899 (citation omitted). A plaintiff can demonstrate that a right is clearly established by identifying a "closely analogous case that the established right to be free from this type of force the police officers used on him" or by showing "that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Id.* (citation omitted). As the Seventh Circuit teaches, "[q]ualified immunity is supposed to protect officers in the close case, and it therefore must apply to the officer's snap judgment in a legally hazy area." *White v. Stanley,* 745 F.3d 237, 241 (7th Cir. 2014).

10

Keeping in mind that police officers often make quick decisions in tense situations, a police officer's use of deadly force to apprehend an unarmed individual is not a "legally hazy area." As the Supreme Court held in 1985, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner,* 471 U.S. at 11. Therefore, at the time Defendant Officers discharged their firearms at Chambers, it was clearly established that "[a]n officer's use of deadly force to apprehend a suspect is unreasonable, absent probable cause that the suspect is dangerous or has committed a violent crime." *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000) (citation omitted). Here, the factual disputes discussed above preclude a finding of qualified immunity at summary judgment. More specifically, viewing the facts and evidence in Plaintiff's favor, at least one Defendant Officer used deadly force after Chambers dropped his weapon and Chambers did not shoot at the police officers or the crowd creating a immediate threat of danger. Furthermore, a witness told one of the officers that the individuals who had committed the violent crime had departed from the scene. Defendant Officers' version of the facts, namely that Chambers' conduct was sufficiently threatening to warrant the use of deadly force, is a question for the jury to decide.

Accordingly, summary judgment is inappropriate under the circumstances because the parties tell different stories of what happened on April 21, 2012. Indeed, Defendant Officers' testimony is inconsistent, especially as to when Chambers dropped his gun and the circumstances leading up to Defendant Officers discharging their weapons. As the Seventh Circuit instructs, "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many

11

occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (citation omitted). The Court therefore denies Defendants' summary judgment motion as Plaintiff's excessive force claim alleged in Count I.

## II.     Count III — Failure to Intervene

Next, Plaintiff alleges a failure to intervene claim in Count III of the Second Amended Complaint. "[A] defendant police officer may be held to account both for his own use of excessive force on the plaintiff, as well as his failure to take reasonable steps to attempt to stop the use of excessive force used by his fellow officers." *Sanchez v. City of Chicago,* 700 F.3d 919, 926 (7th Cir. 2012) (internal citation omitted). "A police officer can be liable for another officer's excessive force only if that officer had a realistic opportunity to intervene and stop the first officer's actions." *Miller,* 761 F.3d at 826; *see also Lewis v. Downey,* 581 F.3d 467, 472 (7th Cir. 2009). "A 'realistic opportunity' means a chance to warn the officer using excessive force to stop." *Miller,* 761 F.3d at 826.

Defendant Officers argue that because Plaintiff cannot establish an excessive force violation in the first instance, Plaintiff cannot show that Defendant Officers failed to prevent fellow officers from violating Chambers' constitutional rights. *See Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005). Because Plaintiff has raised a genuine dispute of material fact whether Defendants used excessive force in their attempt to apprehend Chambers, Defendant Officers' first argument is unavailing.

Next, Defendant Officers argue that even if certain Defendant Officers violated Chambers' constitutional rights, the other Defendant Officers did not have a realistic opportunity

to intervene. Viewing the facts in Plaintiff's favor, there is evidence in the record that at least two Defendant Officers saw Chambers drop his gun before he ran to the fence and it is undisputed that neither of these officers warned the remaining Defendant Officers of such. *See Miller,* 761 F.3d at 826 (realistic opportunity to intervene includes chance to warn officers to stop using excessive force). Nonetheless, Defendant Officers argue that the officers who knew that Chambers had dropped his gun did not have time to warn the other officers based on Defendants' version of the facts, namely, that only one or two seconds had passed between the time when the officers began firing at Chambers and when Chambers jumped over the fence. At this procedural posture, however, the Court must believe Plaintiff's evidence and construe all reasonable inferences in Plaintiff's favor. *See Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Thus, evidence in the record such as Defendant Officer Fisher's testimony that he had enough time to assess the situation after Chambers dropped his handgun, at which time he decided not to fire at Chambers, defeats Defendants' summary judgment motion. (Pl.'s Stmt. Facts ¶ 30.) Accordingly, the Court denies Defendants' motion in regard to Plaintiff's failure to intervene claim in Count III.

### III. Count IV — Intentional Infliction of Emotional Distress

In Count IV of the Second Amended Complaint, Plaintiff brings a common law intentional infliction of emotional distress claim ("IIED"). To establish an IIED claim under Illinois law, a plaintiff must show that "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El*

*v. Cook County Sheriff's Dep't,* 602 F.3d 852, 863-64 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 607 N.E.2d 201, 211 (1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Id.* at 864 (citation omitted).

In the present summary judgment motion, Defendant Officers argue that Plaintiff cannot establish an IIED claim because Defendant Officers acted reasonably and their conduct was not truly extreme and outrageous. First, as discussed above, there is a genuine factual dispute for the jury whether Defendant Officers' conduct was reasonable. Second, Defendant Officers do not explain why their conduct was not truly extreme and outrageous, and viewing the facts and reasonable inferences in Plaintiff's favor, the Court would be hard-pressed to conclude that police officers firing a gun at an unarmed individual is not extreme and outrageous as a matter of law. *See Fox v. Hayes,* 600 F.3d 819, 842 (7th Cir. 2010) ("An important factor in this analysis is whether a defendant abused a position of authority."); *Schroeder v. RGIS, Inc.,* 2013 IL App (1st) 122483 ¶ 27, 992 N.E.2d 509, 517, 372 Ill.Dec. 667, 675 (1st Dist. 2013) ("Whether a defendant abused a position of actual or apparent authority is a factor to consider when determining whether conduct is outrageous."). Last, Defendants' bare-boned argument that there was no intent on their part due to the speed in which the incident unfolded is based on the facts taken in a light most favorable to Defendant Officers, not Plaintiff.

Without citing any legal authority, Defendant Officers also argue that Chambers did not suffer any recoverable emotional distress because he was pronounced dead on the scene. Defendant Officers' argument, however, ignores the fact that Chambers may have suffered

14

emotional distress during the shooting incident before he died. *See Polk v. Dent,* No. 13 C 9321, 2015 WL 74185, at *4 (N.D. Ill. Jan. 5, 2015). Therefore, Defendant Officers' unsubstantiated argument is misplaced.[4]

For these reasons, the Court denies Defendants' summary judgment motion as to Plaintiff's IIED claim in Count IV.

## IV.     Count V — Wrongful Death

In Count V, Plaintiff brings a claim under the Illinois Wrongful Death Act, 740 ILCS 180/1. To establish a wrongful death claim under the Act, Plaintiff must show that "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and (4) pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. P'ship*, 252 Ill.App.3d 260, 192 Ill.Dec. 88, 625 N.E.2d 48, 52 (1st Dist. 1993)).

In the present motion, Defendant Officers argue that their conduct was not willful or wanton under the Illinois Local Government and Governmental Employees Tort Immunity Act. *See* 745 ILCS 10/1-101, *et seq.* Specifically, in "order to protect public funds from being dissipated by damage awards in tort cases, the Local Government and Governmental Employees

---

[4] The Court notes that in Count VI, Plaintiff brings a Illinois Survival Act claim, which is not a stand-alone claim, but the vehicle allowing Plaintiff to bring the present IIED claim. To clarify, the Survival Act "does not create a statutory cause of action; rather, it permits an estate representative to maintain those statutory or common-law actions that had already accrued to the decedent before his or her death and that would otherwise have abated under the common law at the time of death." *Vincent v. Alden–Park Strathmoor, Inc.,* 399 Ill.App.3d 1102, 1103-04, 340 Ill.Dec. 396, 928 N.E.2d 115, 117 (2d Dist. 2010). The Survival Act, for example, provides that actions to recover damages for an injury to the person survive a decedent's death. *See* 755 ILCS 5/27–6.

15

Tort Immunity Act was enacted to shield local public entities and public employees from liability for ordinary negligence committed during the exercise of their duties." *Mitchell v. Special Educ. Joint Agreement Sch. Dist. No. 208,* 386 Ill.App.3d 106, 111, 325 Ill.Dec. 104, 897 N.E.2d 352 (1st Dist. 2008) (internal citation omitted). Section 2-202 of the Tort Immunity Act states that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *See* 745 ILCS 10/2-202. The Tort Immunity Act defines willful and wanton conduct as:

> [A] course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. This definition shall apply in any case where a "willful and wanton" exception is incorporated into any immunity under this Act.

745 ILCS 10/1–210. "Whether an officer acted in such fashion 'is normally a question of fact to be determined by the jury.'" *Chelios v. Heavener,* 520 F.3d 678, 693 (7th Cir. 2008) (citation omitted).

Again, Defendant Officers, relying on their version of the facts, argue that their conduct was reasonable. As the Seventh Circuit teaches, "[a]lthough willful and wanton conduct 'consists of more than mere inadvertence, incompetence, or unskillfulness,' it need not be an 'intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others." *Id.* Construing the evidence and all justifiable inferences in Plaintiff's favor, certain Defendant Officers discharged their weapons at Chambers when he was unarmed, which raises a genuine issue of fact whether Defendant Officers' conduct amounted to "an utter indifference to or conscious disregard" of Chambers' or others' safety.

16

Relying on a 1950 Illinois Appellate Court case, Defendant Officers contend that Chambers' conduct was also willful and wanton, and thus his conduct absolves the alleged willful and wanton conduct on their part. *See Rogers v. Chicago Transit Auth.,* 341 Ill.App. 46, 57-58, 92 N.E.2d 776, 781 (1st Dist. 1950) (discussing contributory willful and wanton conduct). Here, because the parties give different versions of the shooting, whether Chambers' or Defendant Officers' conduct was willful and wanton is a question for the jury. *See Robles v. City of Chicago,* 2014 IL App (1st) 131599 ¶ 17, 10 N.E.3d 236, 240, 381 Ill.Dec. 151, 155 (1st Dist. 2014) ("Whether a person is guilty of wilful and wanton conduct is a question of fact for the jury and should rarely be ruled upon as a matter of law.") (citation omitted). As such, the Court denies Defendants' motion for summary judgment as to Count V of Plaintiff's Second Amended Complaint.

## CONCLUSION

For these reasons, the Court denies Defendants' motion for summary judgment and grants in part Plaintiff's motion to strike.

**Dated:** January 20, 2015

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**